UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Keystone Retaining Wall Systems, Inc.,

Plaintiff,

v.

Civil No. 00-496 RHK/SRN
**MEMORANDUM OPINION AND ORDER**

Rockwood Retaining Walls, Inc., and GLS Industries, Inc., a/k/a Great Lakes Silo,

Defendants.

---

J. Thomas Vitt and Seth Leventhal, Dorsey & Whitney, L.L.P., Minneapolis, Minnesota, for Plaintiff.

Randall T. Skaar, Patterson, Thuente, Skaar & Christensen, P.A., and Malcolm L. Moore, Moore & Hansen, Minneapolis, Minnesota, for Defendants.

---

## Introduction

Plaintiff Keystone Retaining Wall Systems, Inc., ("Keystone") owns a design patent on a "three-faceted, broken front face" retaining wall block, United States Patent No. Des. 380,560 (hereinafter "the '560 patent"). Keystone claims that Defendants Rockwood Retaining Walls, Inc., and GLS Industries, Inc., a/k/a Great Lakes Silo, (collectively "Rockwood") has infringed and continues to infringe on its design patent by making, using, and selling identical retaining wall blocks. Keystone sued Rockwood for patent infringement under 35 U.S.C. §§ 271, 281, and 283-85. Rockwood counterclaimed, requesting a declaratory judgment of non-infringement based on

FILED AUG 2 2 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD_______
DEPUTY CLERK_______

invalidity and unenforceability of the Keystone patent (Counterclaim Count I), and alleging that Keystone tortiously interfered with its existing and prospective business relationships (Counterclaim Count II). Currently before the Court are Defendants' Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment. For the following reasons, the Court will deny Defendants' motion and grant Plaintiff's motion.

## Background

### I. Prosecution History of '560 Patent

Keystone and Rockwood are competitors in the mortarless retaining wall industry. In May 1992, Paul Forsberg ("Forsberg"), Keystone's founder, filed an application with the United States Patent and Trademark Office ("PTO") for a design patent on the "three faceted broken front face of a retaining wall block." (Moore Decl. Ex. 2 (PTO file history for '560 patent).) The application was initially rejected by the PTO as being obvious in view of the prior art and therefore unpatentable. (Id. at Ex. 2-2 (PTO Examiner's findings).) The principal reference relied upon by the PTO Examiner was Patent No. 1,456,498 (hereinafter "the Binns patent"). The Binns patent relates to brick or tile used in furnace construction that, in one of the design figures, has a smooth, three-plane outer front face. (Id. at Ex. 2-4 (response to examiner's findings).) Forsberg argued to the Examiner that the Binns patent was distinguishable because it did not fall within the same field of art as Forsberg's invention–the Binns patent was furnace construction art while

the Forsberg invention was retaining wall art. (Id.) Forsberg also argued that the teaching of the Binns patent could not be termed obvious to someone skilled in the retaining wall art because it was patented over sixty-five years prior to the Forsberg application, and, if it had been obvious back then, Forsberg's invention would have been discovered long ago. Further, Forsberg distinguished the Binns patent because it had a smooth front face while Forsberg's invention called for a rough front face. (Id.)

The Examiner reviewed Forsberg's response and withdrew her rejection of his invention based on the obviousness of the Binns patent. (Id. at Ex. 2-5 (PTO examiner's reevaluation).) The Examiner, however, determined that the application would be rejected based on two additional patents for retaining wall blocks–Patent Nos. 2,819,495 ("the Krausz patent") and 2,882,689 ("the Huch patent"). (Id.) The Krausz patent disclosed the three faceted broken front face but failed to disclose the uninterrupted rough textured face while the Huch patent disclosed only the uninterrupted rough textured face. (Id.) The Examiner determined that the combination the Krausz and Huch patents made Forsberg's invention obvious to a person of ordinary skill in the art. (Id.)

Forsberg objected to this new basis for denying his application by arguing that the Krausz patent is for a corner block in a retaining wall with the outer two legs of the three plane split rock face design at 90° angles relative to one another. (Id. at Ex. 2-6 (response to Examiner's reevaluation).) Conversely, the Forsberg design requires that the outer two legs (or diverging legs) "be disposed relative to one another at a substantially greater

angle, namely, about 120°. Although applicant does not wish to be bound by any particular angle . . . the [legs] must diverge at an angle substantially greater than [90°]." (Id. at Ex. 2-6 (response, p. 9.) (emphasis added).) The Examiner was not persuaded by Forsberg's response, and upheld her previous rejection. (Id. at Ex. 2-7.)

Forsberg then appealed the Examiner's rejection to the Board of Patent Appeals. (Id. at Ex. 2-12 (Brief of Appellant).) Forsberg summarized his invention in his brief to the Board as follows:

> The design of the present invention is directed to the front face of a retaining wall block . . . . Such front face design is comprised of three front face portions of approximate equal dimensions, namely, a center face portion and a pair of side face portions, one extending from each side edge of the center face portion. Each of the front face portions has a textured, split rock surface and each of the side face portions extends from the corresponding side edge of the front face portion at an angle which results in the angle formed by an extension of the side face portions of approximately 120°.

(Id.) Forsberg argued that to modify Krausz so that its outer legs diverged at an angle of about 120° would be inconsistent with the teachings of Krausz both from a design perspective and a utility perspective. (Id.)

The Board agreed with Forsberg that his invention was patentable–but for a different reason. (Id. at Ex. 2-18 (Board decision on appeal).) Quoting Forsberg's summary of his invention verbatim, the Board determined that the simulated brick/stone and mortar facade embodied in the Krausz surface conveys a visual effect which differs remarkably from the Forsberg invention. (Id.) Even if the two front faces were similar,

according to the Board, the Examiner's use of the Huch patent to read on the Krausz patent an uninterrupted rough textured surface was erroneous. (Id.) The Board determined that the Krausz patent, having a design purpose of simulating bricks, taught against the uninterrupted rough textured surface of Huch. (Id.) Accordingly, the Board found that Forsberg's invention was not obvious in light of Krausz and Huch. (Id.)

Notwithstanding the foregoing, the Board rejected the application because of the judicially created double patenting doctrine, which prevents a patentee from gaining an extension on a previous patent by filing for a new patent on a similar product. In this case, the Board held that a previously issued patent, No. Des. 298,463 (hereinafter "the '463 patent"), to Keystone prevented it, as assignee of the Forsberg application, from obtaining the new patent. The '463 patent is a design patent for a retaining wall containing split face front blocks similar to the three faceted front face blocks in the Forsberg application. The '463 patent was the subject of a prior lawsuit by Keystone against a competitor who was using blocks similar to those encompassed in the retaining wall of the '463 patent. Keystone Retaining Wall Sys. v. Westrock, Inc., 997 F.2d 1444 (Fed. Cir. 1993). Keystone lost its suit because the Federal Circuit held that the design patent was for the retaining wall only–not the individual blocks in the wall. Accordingly, Forsberg, on behalf of Keystone, filed a new patent application with the PTO encompassing the individual blocks in the '463 patent.

Forsberg's application could still be approved, however, if Forsberg were willing to file a "Terminal Disclaimer" with the PTO. (Moore Decl. Ex. 2-20 (Terminal Disclaimer).) Forsberg filed such a disclaimer, in which he and Keystone agreed to relinquish a portion of the fourteen-year statutory term given all design patents by tracking the new patent with the statutory term of the '463 patent. (Id.) Accordingly, on July 1, 1997, over five years after the initial filing date, the Forsberg application was granted and the '560 patent was assigned to Keystone with the same expiration date as the '463 patent, November 2002.

## II. '560 Patent

The '560 patent presents one claim, "[t]he ornamental design of a three faceted broken front face of a retaining wall block, as shown and described." (Fernholz Aff. Ex. 1 (the '560 patent).) The '560 patent depicts three embodiments of the claimed design:

Figure 1




Figure 7




Figure 13



(Id.) Figure s 2 and 4 below are the top and front views, respectively, of figure 1. The top and front views of the embodiments depicted in figures 7 and 13 are similar, if not identical, to

figures 2 and 4. (Id.)

Figure 2


Fig. 2

Figure 4


Fig. 4

(Id.) Only the design of the front face of the retaining wall block is patented.

**III. Rockwood's Stones**

Defendants Rockwood and GLS are both owned by Ray and Jerry Price (the "Prices"). (Vitt Aff. Ex. 3 (Price Dep. at 16-18).) The Prices met Forsberg in 1985 and briefly discussed the possibility of manufacturing stones for Forsberg, but in the spring of 1986 the parties ended their discussions. The Prices then began manufacturing their own stones and distributing them through authorized manufacturing dealers ("AMDs"). The Prices make three retaining wall blocks that are the subject of this suit: the Classic, introduced in 1992; the Legend, introduced in 1997; and the Cottage Stone, introduced in 1993 or 1994. The dimensions of these stones, according to Keystone, are identical to the embodiments of its '560 patent.

Rockwood makes seven retaining wall blocks that are derivatives of these three stones: Classic I, Classic II, Legend, Cottage Stone I, Cottage Stone II, Cottage Stone III, and Country Stone. Rockwood is the assignee of two design patents for retaining wall blocks, No. Des. 429,006 and Des. 434,508. The Classic II, Cottage Stone II, Legend,

and Country Stone are covered by Des. 429,006. Rockwood's molds and splitter blades used to cut these stones are manufactured to create the following dimensions. (Price Decl. ¶ 10.) The Cottage Stone I has a center face of 5.75 inches and two side faces of slightly greater than 3.125 inches each. (Id. at ¶ 3.) The legs of the Cottage Stone I diverge at an angle of 102°. (Id.) The Cottage Stone II has a center face of 6 inches, side faces of 2.875 and 3.125, and an angle of 100°. (Id. at ¶ 5.) The Classic I has a center face of 10 inches and side faces of greater than 4 inches. (Id. at ¶ 7.) The Classic II has a center face of 11 inches and side faces of approximately 3 and 4 inches. (Id. at ¶ 9.) The Cottage III has a curved front face with no sides. (Id. at ¶ 11.) The Legend is the same stone as the Classic stone and the Country stone is the same as the Cottage. (Id. at ¶¶ 12-13.)

## Analysis

## I. Defendants' Motion for Summary Judgment

### A. Standard of Decision

"[S]ummary judgment is as appropriate in a patent case as in any other." Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 852 F.2d 1557, 1561 (Fed. Cir. 1988) (quotation and citations omitted). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). The Court views evidence and the inferences which may be reasonably drawn from it in the light most favorable to the nonmoving party. See Enterprise Bank v.

Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see also Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. See Enterprise Bank, 92 F.3d at 747; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must demonstrate the existence of specific facts that create a genuine issue for trial; mere allegations or denials are not enough. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. See Liberty Lobby, 477 U.S. at 250.

The Court does not weigh facts or evaluate the credibility of affidavits and other evidence on a motion for summary judgment. The nonmovant, however, cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties. Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law," that is, it must be material to an essential element of the specific theory of recovery at issue. See Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). Essentially, the Court performs the threshold inquiry of determining whether there is need for a trial. See Liberty Lobby, 477 U.S. at 250.

Rockwood argues that summary judgment should be granted in its favor because (1) its products do not have "three front face portions of approximate equal dimensions,"

and (2) the side portions of the Cottage stone blocks do not extend from the front face portion "at an angle which results in the angle formed by an extension of the side face portion of approximately 120°." (Defs' Mem. in Supp. of its Mot. for Summ. J. at 1 ("Defs' Supp. Mem.").) Rockwood also argues that its Cottage Stone II, Classic II, and corresponding Legend and Country Stone blocks do not infringe because they are made in accordance with Rockwood's '006 patent. (Id.)

**B. Design Patent Infringement**

Determining whether a design patent has been infringed requires a two-step analysis. First, the court must construe the patent claim to determine its meaning and scope as a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). Second, the properly construed patent claim must be compared to the accused design to determine whether there has been infringement. Id. This second step is a question of fact. Id.

***1. Claim Construction***

Keystone argues that there is no need to construe the claim in the '560 patent because the claim of a design patent is defined by reference to the patent drawings, and there is no dispute between the parties about the ornamental nature of Keystone's design or about any words in the patent claim. (Pl.'s Mem. in Opp'n to Defs' Mot. for Summ. J. at 11 ("Pl.'s Opp'n Mem.").) Rockwood responds that the Court must construe the claim in light of Keystone's limitation of the design in the prosecution history.

Unlike claim construction for a utility patent, which requires the Court to define "words" used in a claim, the process of claim construction for a design patent "must be adapted to the practice that a patented design is claimed as shown in its drawing. There is usually no description of the design in words [.]" Goodyear Tire & Rubber Co. v. Hercules Tire and Rubber Co., Inc., 162 F.3d 1113, 1116 (Fed. Cir. 1998). Design patents are limited to what is shown in the application drawings and are narrow in scope. See Rockport Co., Inc. v. Deer Stags, Inc., 65 F. Supp. 2d 189, 192 (S.D.N.Y. 1999); Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995).

Rockwood argues that when Keystone summarized its invention for the PTO Examiner and later the Board, using the terms "approximate equal dimensions" and "approximately 120°," it narrowed its design patent to these dimensions and the Court should construe the design patent as limited by these statements. The Court agrees that the design patent is limited to approximately equal dimensions and angles but not for the reasons Rockwood asserts. In looking at the figures depicted in the '560 patent, one can see that the stone has three faces of approximately equal dimensions. This fact is best depicted in figures 2 and 4 above, which clearly indicate three approximately equal front faces. The top and front views of the two other embodiments, figures 7 and 13, also indicate front faces of approximately equal dimensions. (Fernholz Aff. Ex. 1 ('560 patent, figures 8-10 and 16).)

In addition to equal front faces, the angles created by extending the diverging legs, as depicted in the figures, are approximately 120°. Although it is difficult to measure the angles of the stones depicted in the patent due to the uneven lines of the drawings, the Court is persuaded that the angle of each stone is approximately 120°. The extended angles of each stone embodiment in the '560 patent are as follows: the stone depicted in figures 1-6 has an angle of approximately 116.5°, the stone depicted in figures 7-12 has an angle of approximately 118.5°, and the stone depicted in figures 13-18 has an angle of approximately 117°.[1] Accordingly, the Court construes the '560 patent as having diverging legs that if extended would create an angle of approximately 120° and having approximately equal front faces, as depicted in the patent drawings.

**2. *Infringement***

Having construed the claim, the next step is to compare the construed patent claim to the accused design to determine whether there has been infringement. Infringement of a design patent requires that the designs have the same general visual appearance, such

---

[1] Although Keystone measures the angles of the three embodiments at 107°, 108°, and 110°, in figures 1, 7, and 13, respectively, the Court will not consider these measurements. These measurements are of embodiments that do not face forward, resulting in a measurement that is a derogation of basic geometry. Further, Keystone has measured the <u>same</u> stones in figures 2, 3, 8, 9, and 15, and calculated <u>different</u> angels. Keystone also measured the angles of figures 2, 3, 8, 9, and 15, and calculated angles that were closer to 115°. The difference between Keystone's calculations and the Court's amounts to where the line is drawn on the side face of the stone drawing, because it is an uneven surface it is susceptible to multiple calculations. This discrepancy is the reason the angles are only approximately calculated, as an exact calculation would be impossible.

that it is likely that the purchaser would be deceived into confusing the design of the accused article with the patented design. In determining whether a design patent is infringed, a court must apply a two-part test. Unidynamics Corp. v. Automatic Prods. Int'l, Ltd., 157 F.3d 1311, 1323 (Fed. Cir. 1998). The first part of the test, known as the "ordinary observer" test, is drawn from the Supreme Court's decision in Gorham Co. v. White, 81 U.S. (14 Wall.) 511 (1871). The second part of the test, the "points of novelty" test, requires that the accused device "appropriate the novelty in the patented device which distinguishes it from the prior art." Litton Sys., Inc. v. Whirlpool Corp., 728 F.2d 1423, 1444 (Fed. Cir. 1984) (citation omitted); see also Goodyear Tire, 162 F.3d at 1118.

a. Ordinary Observer

In Gorham, the Court stated:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

Gorham, 81 U.S. at 528. Rockwood argues that no reasonable jury could find that its products would be confused by the ordinary observer with the '560 patent. The Court disagrees. Looking at the embodiments depicted in the '560 patent and the alleged infringing products, the Court concludes that a reasonable jury could find that the ordinary observer would be confused between the two stones. The Rockwood stones are

three faced, uneven textured stones, with similar dimensions to the '560 patent.[2] (Id. at ¶ 5.) Although Rockwood argues that the legs of the Cottage Stone I diverge at an angle of 102° and the legs of the Cottage Stone II diverge at an angle of 100°, whether these angles create a stone that is similar to the one depicted in the '560 patent is for a jury to determine. The Court concludes that a reasonable jury could find that an angle of approximately 100° creates the same stone as one with an angle of approximately 120°. The accused stones look remarkably similar to the stones depicted in the '560 patent, creating a genuine issue for trial as to whether an ordinary observer would be confused by the two stones.

b. Points of Novelty

It is not enough that the accused product could be confused with the patented design by the ordinary observer–the confusion must be based on the similarities in the points of novelty between the accused product and the patent. The points of novelty relate to differences from prior designs, and are usually determinable based on the prosecution history. Goodyear Tire, 162 F.3d at 1118. In conducting such analysis, the

---

[2] Rockwood asserts that the Cottage III stone has a curved front face with no sides; therefore, it cannot infringe on the '560 patent. Keystone requests that the Court defer ruling on the infringement issue of the Cottage III stone until it has the opportunity to observe the design in the field to determine whether the commercial stone has a rounded front face. Fed. R. Civ. P. 56(f). The Court will grant the request. If it is determined, however, that the Cottage III is sold with a rounded front face, then Rockwood would be entitled to summary judgment as to that particular stone–plainly the '560 patent does not cover rounded front faced stones.

patented design is viewed in its entirety as it is claimed. Id. As for other patented inventions, reference is made to the prior art and the prosecution history in order to give appropriate weight to the factors that contributed to patentability. L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1125 (Fed. Cir. 1993) (citing Winner Int'l Corp. v. Wolo Mfg. Corp., 905 F.2d 375, 376 (Fed. Cir. 1990)).

Keystone argues two points of novelty: "the '560 patent shows the front face of a concrete retaining wall block with (1) three planes, and (2) a roughened, uneven texture." (Pl.'s Opp'n Mem. at 3.) The PTO Board, in distinguishing the '560 patent from Krausz, stated that the stone in the '560 patent conveyed a different visual effect than Krausz because Krausz' stone was designed to simulate a brick/stone and mortar facade, while the '560 stone was designed with a roughened, uneven texture. Keystone relies on this statement to prove its points of novelty. Prior to this statement by the Board, however, Forsberg had described his invention as having a "front face design [] comprised of three front face portions of approximate equal dimensions . . . . Each of the front face portions has a textured, split rock surface and each of the side face portions extends from the corresponding side edge of the front face portion at an angle which results in the angle formed by an extension of the side face portions of approximately 120°." Forsberg's summary of his invention accurately describes the design of the stone as it appears in the '560 patent.

The Court, therefore, considers the points of novelty of the '560 patent to include: (1) three planes, (2) a roughened, uneven texture, (3) approximately equal front and side faces, and (4) side legs diverging at an angle of approximately 120°. The Court notes that these "points of novelty" are based substantially on the '560 patent and the prosecution history. The need to add equal front and side faces as a point of novelty is clear from figures 4, 10, and 16 of the '560 patent. The addition of an angle of approximately 120° as a point of novelty is also necessary because this element was relied upon by Forsberg in distinguishing his patent from the Krausz patent, which had diverging legs of 90° angles.[3]

Using these points of novelty, the Court concludes that there is a genuine issue of material fact as to whether Rockwood's stones infringe the '560 patent. Although the dimensions of Rockwood's stones are different than those depicted in the '560 patent, the undersigned cannot conclude that as a matter of law the different dimensions in the Rockwood stone's make it look any different than the ones depicted in the '560 patent. Accordingly, the question of infringement must be presented to a fact-finder. The Court will deny Defendants' Motion for Summary Judgment that it does not infringe the '560

---

[3] It was not necessary, however, for Forsberg to distinguish his patent from the Krausz patent by arguing the diverging legs, if extended, would create an angle of approximately 120° because the Krausz patent, having 90° angles could not, as a matter of geometry, have legs that if extended would form any angle–the legs would simply run parallel to each other.

patent.[4]

## II. Plaintiff's Motion for Partial Summary Judgment

Rockwood has counterclaimed against Keystone requesting a declaratory judgment of non-infringement based on invalidity and unenforceability of the Keystone patent (Counterclaim Count I), and alleging that Keystone tortiously interfered with its existing and prospective business relationships (Counterclaim Count II).

### A. Invalidity and Unenforceability

Rockwood alleges that the '560 patent is invalid because Forsberg, and later Keystone, did not fully disclose all of the inventors of the three faceted broken front face retaining wall block. During discovery, Rockwood contended that Michael Woodford ("Woodford"), a former employee of Keystone's competitor Anchor Block, should have been named as a co-inventor of the '560 patent.[5] (Leventhal Aff. Ex. 2, No. 5 (Defs' Answers to Plf's First Set of Interrogatories).) By failing to disclose Woodford, Rockwood claims Keystone withheld information from the PTO with the intent to deceive it, which would render the '560 patent invalid. (Id.) In support of its summary judgment

---

[4] Rockwood argues that its Classic II, Cottage Stone II, Legend, and Country Stone cannot infringe the '560 patent because they are covered by its own patent, Patent No. Des. 429,006. The fact a product is patented, however, "presents no legal or evidentiary presumption of noninfringement." Hoechst Celanese Corp. v. BP Chem. Ltd., 78 F.3d 1575, 1582 (Fed. Cir. 1996).

[5] Rockwood also asserted that Dick J. Sievert should have been named as a co-inventor. (Leventhal Aff. Ex. 2 n.5.) As Mr. Sievert is deceased, there is no evidence to support this assertion.

motion, Keystone argued that there is insufficient evidence to find that Woodford was a co-inventor, or that it acted with an intent to deceive the PTO by omitting Woodford as an inventor. Rockwood, in its opposition memorandum, now claims that Mike Grow ("Grow"), an employee of a contract manufacturer to Keystone, was the unnamed co-inventor. (Defs' Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 3 ("Defs' Opp'n Mem.").) Rockwood's only mention of Woodford is to say that

> Keystone bases the entire argument in its motion for partial summary judgment as to patent invalidity on allegations that Michael Woodford's testimony and conduct are not sufficient to prove Paul Forsberg was not the sole inventor of the '560 patent. Regardless of Woodford's contribution to the invention of the '560 patent, Mike Grow was at least a co-inventor if not the sole inventor of the '560 patent.

(Id.) The Court will assume that Rockwood's argument is that both Woodford and Grow were unnamed co-inventors.

To establish invalidity based on inequitable conduct, Rockwood must show that Keystone failed to disclose material information with an intent to deceive or mislead the PTO. Critikon, Inc. v. Beckton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997) (citation omitted). Rockwood has the burden of proving inequitable conduct by clear and convincing evidence. FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1417 n.11 (Fed. Cir. 1987).

### *1. Failure to Disclose Woodford as Co-inventor*

Having failed to argue Woodford's contribution to the invention in its opposition

memorandum, the Court must speculate, based on the record before it, what, if any, contribution Woodford made to the invention. Woodford testified that, together with Grow, he invented the faceted split front face of the stone. (Leventhal Aff. Ex. 4 at 11 (Woodford Dep.).) Woodford further testified that he and Grow had first seen the three-plane split of a stone "in our minds, we'd seen it before it was done. I mean, we explained how it could be done to Forsberg in 1986, and subsequent to that, [Grow], the way I understand things, was the first person to physically do it." (Id. at 30.) Rockwood offers no additional evidence to support its assertion that Woodford and Grow had the idea in their minds back in 1986. (Id.)

The burden of proving that the patentee failed to name a co-inventor is a heavy one. Hess v. Advanced Cardiovascular Sys, Inc., 106 F.3d 976 (Fed. Cir. 1997). "The temptation for even honest witnesses to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier, is simply too great to permit a lower standard." Id. With this high standard in mind, the testimony of Woodford is not sufficient to create a genuine issue for trial. This testimony not only lacks any corroboration or specificity regarding the claimed invention, it is, in fact, specifically refuted by Grow.

Even if the testimony of Woodford were sufficient to create an issue for trial, Rockwood has failed to come forth with any evidence that Keystone withheld this information from the PTO with the intent to deceive it. Accordingly, the Court concludes

that there is insufficient evidence to create a triable issue as to whether Keystone's alleged failure to disclose Woodford as a co-inventor amounted to inequitable conduct, such that the '560 patent is invalid.

### *2. Failure to Disclose Grow as Co-inventor*

Rockwood, in its opposition memorandum, argues that Grow was actually the inventor of the three-planed split front face stone. However, Grow has averred as follows:

> I understand the Rockwood is claiming that I should be considered an inventor of the three-planed split front face design for a retaining wall block. That is not correct. The shape of the three-planed split front face was Paul Forsberg's design and his decision to implement. I have always considered the three-planed split front face to be Paul Forsberg's idea. At Paul's request I took the necessary steps to produce his new product.

(Grow Aff. ¶ 4 (emphasis added).) "When an alleged omitted co-inventor does not claim to be such, it can hardly be inequitable conduct not to identify that person to the PTO as an inventor." Pro-Mold and Tool Co., Inc. v. Great Lakes Plastics, Inc., 75 F.3d 1568, 1576 (Fed. Cir. 1996). Rockwood's allegations cannot survive Grow's own testimony to the contrary; therefore, Rockwood's claim of invalidity, based on the failure to disclose a co-inventor, must be dismissed.

## B. Tortious Interference Claims

This claim is based on cease-and-desist letters sent by Keystone to Rockwood's AMDs. The first letter, sent on September 2, 1997, stated that Keystone was the owner of

a patent for the ornamental design of a three faceted front face of a retaining wall block, and infringing on this patent could be grounds for damages and injunctive relief. (Defs' Answer and Counterclaim Ex. A.) On June 18, 1998, Keystone's counsel sent cease-and-desist letters to seven of Rockwood's AMDs (Colorado Concrete Mfg., Burd Concrete Products, Taylor Concrete Products, Matt Stone East, Inc., Glenstone Block Co., Grandview Block and Supply, and Lightweight Block). (Id. Exs. B-H.) These letters included a copy of the '560 patent and disclosed that the patent was under re-examination.[6] The letters further warned the AMDs that although Keystone did not plan to bring legal action against any infringing AMD while the patent was under re-examination, if the AMDs continued to infringe, it would bring an action for damages after the re-examination is approved. (Id.)

Rockwood contends that, Keystone, by sending these letters, tortiously interfered with its existing and prospective business relationships with the AMDs. Keystone counters that it cannot be held liable for sending these letters because sending them was ancillary to litigation and therefore constituted protected activity pursuant to the Noerr-Pennington doctrine. The Court agrees that under the Noerr-Pennington doctrine Keystone cannot be held liable for tortious interference because the cease-and-desist

---

[6] The '560 patent was under re-examination in light of newly identified publications of similar rock wall blocks. (Moore Decl. Ex. 3 (re-examination history of '560 patent).) In early 1999, Keystone was granted a re-examination certificate of patentability. (Id.)

letters were required by 35 U.S.C. § 287 to bring suit for patent infringement. The Court, however, does not conclude that any letter sent to a third party which is ancillary to litigation is immune from tort claims by virtue of the Noerr-Pennington doctrine.

The Noerr-Pennington doctrine was first pronounced in two antitrust cases and was based on two separate principles: statutory interpretation of the Sherman Act and the First Amendment. See Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965). The doctrine has been extended to include cases outside the antitrust context based solely on the First Amendment right to petition the government. See Hufsmith v. Weaver, 817 F.2d 455, 458-59 (8th Cir. 1987) (holding that the doctrine is not limited to antitrust context). The First Amendment states: "Congress shall make no law respecting . . . the right of the people . . . to petition the Government for a redress of grievances." The right to access the courts is just one aspect of the right to petition. See California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972). Therefore, the "Noerr-Pennington doctrine protects the defendants from liability on tortious interference claim to the extent that plaintiffs' claims are based upon . . . litigation activities." First Nat'l Bank v. Marquette National Bank, 482 F. Supp. 514, 524-525 (D. Minn. 1979), aff'd, 656 F.2d 191 (8th Cir. 1980).

Whether "litigation activities" includes sending cease-and-desist letters to third parties has not been addressed by either the United States Supreme Court or the Eighth

Circuit. Most courts that have considered the issue, however, have extended Noerr-Pennington immunity to shield non-judicial acts that are "reasonably and normally attendant upon protected litigation." See, e.g., Matsushita Elecs. Corp. v. Loral Corp., 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (extending immunity to infringement warning letters sent to customers of defendants) (quoting Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir. 1983) (citing cases)). The Tenth Circuit, however, declined to extend the doctrine to a cease-and-desist letter from one private party to another private party in Cardtoons v. Major League Baseball Players Ass'n, 208 F.3d 885 (10th Cir. 2000) (en banc).

Cardtoons involved a lawsuit brought by Cardtoons, the creator of parody baseball trading cards, seeking a declaratory judgment that its cards did not violate the Major League Baseball Players Association's publicity rights, and damages based on tortious interference. Id. at 890. The declaratory judgment suit was prompted by a cease-and-desist letter sent by Major League Baseball. Id. Major League Baseball argued that the Noerr-Pennington doctrine immunized it from Cardtoons' tortious interference claim. Id. The Tenth Circuit found the doctrine inapplicable and held that "[a] letter from one private party to another private party simply does not implicate the right to petition [the government], regardless of what the letter threatens." Cardtoons, 208 F.3d at 892.

This Court finds the Tenth Circuit's reasoning persuasive. However, unlike the facts presented in Cardtoons, the instant case involves cease-and-desist letters that are

required under the statute in order for a patentee to recover damages for infringement. Section 287 of Title 35 of the United States Code requires that an alleged infringer have notice of the patent before it can be held liable for infringement. Keystone's stones are not marked as patented due to the expense of marking each stone; therefore, Keystone must notify the alleged infringer of its patent in order to recover damages. Accordingly, unlike Cardtoons, where the letters threatening litigation were not required, the notice requirements of 35 U.S.C. § 287 put Keystone's actions within the ambit of immunized activity under the Noerr-Pennington doctrine.

Having concluded that the doctrine applies, the Court must then consider whether the instant suit is a "sham," because sham lawsuits fall outside the Noerr-Pennington cloak of immunity. Razorback Ready Mix Concrete Co. v. Weaver, 761 F.2d 484, 487 (8th Cir. 1985). A sham lawsuit is "where a defendant's resort to the courts is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process . . . ." Id. A lawsuit is a sham if it is both (1) objectively baseless in that no reasonable litigant could expect success on the merits and (2) subjectively motivated by bad faith. Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 61-62 (1993).

Rockwood argues that Keystone cannot claim the Noerr-Pennington doctrine because its lawsuit is a sham. There is no evidence whatsoever that would support such a

finding. Aside from Rockwood's argument that the '560 patent is "so invalid" as to make this suit a sham, an argument the Court rejected above, Rockwood has not offered any evidence to support a finding that this suit is objectively baseless in that no reasonable litigant could expect success on the merits and that Keystone was motivated by bad faith in bringing this suit. Keystone is therefore entitled to Noerr-Pennington immunity and Rockwood's claim of tortious interference must be dismissed.

## Conclusion

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 40) is **DENIED**; and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 30) is **GRANTED**. Defendants' Counterclaim is **DISMISSED WITH PREJUDICE**.

Dated: August 22, 2001

Richard H. Kyle
United States District Judge

**Please forward this announcement to the recipient of this fax.**

---

# The United States District Court, District of Minnesota announces two new programs!

**Expedited Trials** –The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition. Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

**Courtroom Technology – Phase II** – In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

**For additional information on either program please visit our website at www.mnd.uscourts.gov.**

---

700 Federal Building
316 North Robert Street
St. Paul, MN 55101
(651) 848-1100

202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5000

417 U. S. Courthouse
515 West First Street
Duluth, MN 55802
(218) 529-3500